# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RAYVERN MATHIS, SR., ) | |
|     Plaintiff, ) | Civil Action No. 10-172 Erie |
| ) | |
| v. ) | Senior District Judge Cohill |
| ) | Magistrate Judge Baxter |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
|     Defendant. ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that Plaintiff's Motion for Summary Judgment [ECF No. 9] be denied. It is further recommended that the Commissioner's Motion for Summary Judgment [ECF No. 11] be granted and the decision of the Commissioner denying Plaintiff's application for Supplemental Social Security Income and Disability Insurance Benefits be affirmed.

### II.    REPORT[1]

#### A.    Relevant Procedural History

Plaintiff Rayvern Mathis, Sr. ("Mathis"), commenced this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security

---

[1] **Error! Main Document Only.** The Court's recitation of relevant facts and procedural history is derived from the transcript of the administrative record filed by the Commissioner as part of her answer in accordance with § 205(g) of the Act, 42 U.S.C. § 405(g) [ECF No. 4], the pages of which are referred to hereinafter as "Tr. __."

1

Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. Mathis protectively applied for DIB and SSI benefits on June 4, 2007, alleging disability as of November 24, 2006. (Tr. 134, 137, 153). The applications were administratively denied on November 13, 2007. (Tr. 67, 71). Mathis responded on November 23, 2007, by filing a timely request for an administrative hearing. (Tr. 132-133). A brief hearing was conducted before Administrative Law Judge Douglas Cohen (the "ALJ") on June 8, 2009. (Tr. 52-57). Mathis appeared without counsel and asked for a postponement. (Tr. 54). The ALJ agreed to postpone Mathis' hearing and instructed him to secure a representative. (Tr. 55-56). A second hearing was held before the ALJ on September 11, 2009. (Tr. 32). Mathis, who was represented by counsel, appeared in Erie, Pennsylvania, and provided testimony concerning his medical condition. (Tr. 34-46). Testimony was also taken from Fred A. Monaco, an impartial vocational expert. (Tr. 10, 46-49). The ALJ presided over the hearing from Mars, Pennsylvania, by means of a teleconferencing apparatus. (Tr. 10).

In a decision dated November 17, 2009, the ALJ determined that Mathis was not "disabled" within the meaning of the Act. (Tr. 7-31). The Appeals Council denied Mathis' request for review on May 20, 2010, thereby making the ALJ's decision the final decision of the Commissioner in this case. (Tr. 1). This action was thereafter commenced on July 16, 2010. Mathis and the Commissioner filed motions for summary judgment on December 31, 2010, and February 7, 2011, respectively. [ECF Nos. 9 & 11]. These motions are now ripe for consideration.

### B. Factual Background

Mathis was born on April 9, 1965. (Tr. 66). At the time of the ALJ hearing, Mathis was 44 years of age. He has a high school education and has previous work experience as a jitney

driver and forklift operator, a laborer, and a packer. (Tr. 30, 158). Mathis alleges that his ability to work is limited by a herniated disc and pinched nerve in his lower back, which he allegedly suffered as a result of an automobile accident that occurred on November 24, 2006. (Tr. 157).

### C. Medical Background

Following the accident, Mathis was taken to Hamot Medical Center ("Hamot") in Erie, Pennsylvania, where he was treated by Dr. Kenneth Patton. (Tr. 264-268). He complained of sharp pain in his lower back that was shooting into the middle portion of his back. (Tr. 264). His injury was diagnosed as a strained spinal muscle or ligament. (Tr. 267). Mathis was instructed to avoid standing or sitting in one place for more than thirty minutes at a time and was informed that his back pain would improve more rapidly if he would "remain active." (Tr. 267). He was also told that pain radiating from his back into his legs, bowel or bladder control problems, or unusual feelings of "weakness or numbness" may be signs of a "herniated lumbar disc," and that he should seek further medical attention if he experienced such "serious symptoms." (Tr. 267). Mathis was prescribed Flexeril and Ibuprofen and was discharged later that day. (Tr. 265).

On November 30, 2006, Mathis was examined by Dr. Anthony Snow, who was the Chief Medical Officer for Community Health Net. (Tr. 340). Dr. Snow gave Mathis prescriptions for muscle relaxers and anti-inflammatories and scheduled him for an MRI, which was performed on December 15, 2006. The MRI revealed disc herniations at L3-4 and L4-5, and a small disc herniation at L5-S1. (Tr. 350). Dr. Snow examined Mathis again on January 8, 2007. (Tr. 210). Mathis continued to complain of pain in his back. (Tr. 210). He was referred to Saint Vincent

3

Neurosurgery for a consultative assessment, prescribed Flexeril and Lodine, and instructed to elevate his feet as much as possible. (Tr. 210).

Dr. William P. Diefenbach, a neurosurgeon affiliated with Saint Vincent Neurosurgery, examined Mathis on March 12, 2007. (Tr. 313). Mathis complained of pain in his back and left leg. (Tr. 313). He expressed reluctance to undergo surgery. (Tr. 313). Dr. Deifenbach recommended epidural steroid injections to reduce Mathis' pain, which were later administered by Dr. Paul Carnes on August 27, 2007, and November 27, 2007. (Tr. 287, 294, 302).

Plaintiff returned to Dr. Snow on April 3, 2007, at which time he exhibited tenderness in his lower spine and buttock muscles. (Tr. 209). Dr. Snow prescribed Parafon Forte DSC, Lodine, and Lortab and scheduled a follow-up visit. (Id.). Plaintiff followed-up with Dr. Snow on June 4, 2007, at which time he exhibited decreased range of motion in his back, tenderness in his lumbosacral spinal area, and decreased straight leg raising. (Tr. 208). He was continued on Lortab and Parafon Forte DSC, and was given a refill of Ibuprofen. (Id.).

On September 10, 2007, Plaintiff went to the Emergency Room at Hamot Hospital complaining of sharp pain in his lumbar spine radiating down his left leg. (Tr. 220). Plaintiff was diagnosed with acute sciatica and prescribed Robaxin and Lortab. (Tr. 225).

Dr. John J. Kalata performed a consultative physical examination of Mathis on October 30, 2007. (Tr. 228-238). Dr. Kalata made the following observations in his examination report:

> He had difficulty raising his arms over his head and the range of motion of the lower legs are very diminished. He could not toe walk, heel walk, or crouch. Examination of his back reveals tenderness of his whole lumbar area.

(Tr. 232). Based on his examination findings, Dr. Kalata opined that Mathis could occasionally lift or carry objects weighing two to three pounds; stand or walk for only one hour, and sit for only four hours, during the course of an eight-hour workday; perform limited pushing, pulling

4

and reaching; never kneel, stoop or crouch; and occasionally bend, balance or climb. (Tr. 236, 238). He noted further that Mathis needed to avoid moving machinery, heights and vibration. (Tr. 236).

Gary Empfield ("Empfield"), a nonexamining medical consultant, opined on November 6, 2007, that Mathis was capable of performing an unlimited range of sedentary work activities. (Tr. 58-63). Specifically, Dr. Empfield suggested that Mathis could stand or walk for up to two hours, and sit for up to six hours, during the course of an eight-hour workday. (Tr. 59). He also indicated that Mathis could frequently lift or carry objects weighing up to ten pounds, and could perform unlimited pushing and pulling. (Id.). In addition, no postural, manipulative, visual, communicative or environmental limitations were identified. (Tr. 60-61).

After receiving the epidural steroid injections from Dr. Carnes, Mathis continued to experience pain in his back and a decreased range of motion. (Tr. 317). On December 10, 2007, Dr. Snow ordered a "lumbar support" in order to alleviate Mathis' discomfort. (Tr. 317). One month later, Mathis told Dr. Snow that his pain was getting worse, and that he was willing to "do almost anything" to improve his condition. (Tr. 318). He claimed that his feet were "burning" from pain radiating from his lower back, and that he could not "sit or stand comfortably." (Tr. 318).

Mathis returned to Dr. Snow's office on February 11, 2008, complaining of pain in his lower back. (Tr. 319). He also informed Dr. Snow that he was having difficulty maintaining an erection. (Tr. 319). Suspecting that Mathis' symptoms were attributable to nerve damage, Dr. Snow recommended another evaluation by a neurosurgeon. (Tr. 319). Dr. Snow completed an "employability assessment form" for the Pennsylvania Department of Public Welfare ("DPW") indicating that Mathis was "permanently disabled" due to chronic back pain and lumbar disc

disease. (Tr. 240). Dr. Snow reported that Mathis' "severe pain" would not "allow him to work or ambulate." (Tr. 241).

An MRI scan conducted on March 30, 2008, revealed that Mathis was suffering from disc protrusions in his neck and back. (Tr. 340, 351-353). Dr. Snow observed on April 1, 2008, that Mathis' pain was "getting worse instead of better." (Tr. 320). Mathis complained of pain in his neck, back and buttocks. (Tr. 320). He asked to be referred to a specialist. (Tr. 320). During a follow-up visit with Dr. Snow on April 30, 2008, Mathis stated that the pain in his back was getting worse, and he was experiencing tenderness in the lumbosacral spine area "shooting in the buttocks bilaterally." (Tr. 321).

On July 14, 2008, Mathis was evaluated by Dr. Frank A. Zimba, a neurosurgeon affiliated with Saint Vincent Neurosurgery. (Tr. 322-323). Dr. Zimba noted that recent MRI results demonstrated "primarily degenerative disc disease in the cervical and lumbar spine without any significant neurologic compression except on the right at L5-S1." (Tr. 322). Mathis' "chief complaint" was that he was experiencing neck pain, although he also complained of bilateral axial low back pain. (Tr. 322). Dr. Zimba noted that Mathis did "not have any radicular component into his legs or arms in his description," and that he had been "minimally benefited by pain management," but responded "nicely to narcotics." (Id.). Dr. Zimba then concluded his examination report by noting the following:

> ASSESSMENT: Patient presents with a MVA of which he is a litigant with lumbago, thoracalgia and cervicalgia and no evident neurologic compression. Patient has a histrionic compensatory type exam and there is no surgical intervention that I would consider entertaining for this individual.
>
> PLAN: I suggested to him that his best options would be primarily medical management including, but not limited to, Duragesic or Fentanyl patches cutaneously and then consideration for spinal cord stimulation or intrathecal narcotic pump. He may be best served by completion of the legal tasks ahead of

6

>him and then he may actually be able to get better. Patient was discharged from
>follow up in our clinic as felt indicated by his primary care physician.

(Tr. 322-323).

Mathis returned to Dr. Snow's office on July 24, 2008, complaining of severe pain in his neck. (Tr. 371). Dr. Snow expressed a reluctance to provide Mathis with extended prescriptions for narcotic medications. (Id.). A urinary toxicology screening was ordered to ensure that Mathis was taking his medications as prescribed. (Id.). Dr. Snow also referred Mathis to Pittsburgh pain management; however, Mathis subsequently informed Dr. Snow that he was not able to go to pain management in Pittsburgh because they didn't accept his insurance. (Tr. 369).

On September 2, 2008, Dr. Snow reported that Mathis was "not moving much at all because of the pain in his back" and that he could "barely stand." (Tr. 369). Mathis stated that his pain was "unbearable." (Id.). Dr. Snow determined that Mathis "urgently" needed to be evaluated for "acute cord compression syndrome." (Id.).

On October 1, 2008, Bernadine Bagniszewski ("Bagniszewski"), a certified registered nurse practitioner employed by Community Health Net, examined Mathis on October 1, 2008. (Tr. 367). Mathis claimed that he could not sit or stand for any period of time and that his legs had been "giving out on him." (Id.). His prescription for Lortab was discontinued, and he was given a new prescription for Percocet. (Id.).

On November 4, 2008, Mathis indicated that he had been evaluated by a neurosurgeon affiliated with the University of Pittsburgh Medical Center ("UPMC"), who opined that "there was no neurosurgical intervention that would help him," but recommended pain medication and medical management. (Tr. 364). Dr. Snow observed that Mathis was "pretty frustrated" and "willing to go anywhere to get some relief." (Tr. 364). Mathis continued treating with Dr. Snow

up to the date of his second ALJ hearing, reiterating his complaints of pain in his neck, back, legs, and left arm. (Tr. 355-360).

### D. Disability Hearing

At the disability hearing conducted on September 11, 2009, Mathis testified that he has a GED and can read, write and perform simple math. (Tr. 35). At the time of the hearing, Mathis was no longer seeing Dr. Snow, but was treating with his family doctor, Dr. Grande. (Tr. 35). He last worked in or around March 2006 at Bush Industries. (Tr. 35, 40). He was later incarcerated for failure to pay child support from around July to September 2006. (Tr. 40). Mathis testified he was also incarcerated for failure to pay child support in 2003 and 2004. (Tr. 41). He lives in a house with his 76 year old father and two younger brothers, both of whom are disabled. (Tr. 41-42). Mathis testified that he spent most of his time laying on the couch or sitting outside with his dog. (Tr. 42).

Mathis stated that he could sit for only ten to twenty minutes at a time before having to get up and stand to "try to relieve a little bit of the pressure," and that his most comfortable position was lying flat. (Tr. 43). He testified further that he could stand for only fifteen to twenty minutes, and would not be able to walk a block without stopping and sitting down at least twice. (Tr. 43). Mathis testified that he felt pain up and down his spine, in his neck, down his legs, and in his shins and the back of his legs. (Tr. 43). He stated that he could not do any yard work, household chores, or grocery shopping. (Tr. 43-44). He testified that he was taking pain medication and muscle relaxers, including "Vicodin 10's, soma's,… Valium's and anti-inflammatories," which helped "a little bit," but made him feel intoxicated. (Tr. 45).

After Mathis' testimony, the ALJ called upon a vocational expert, Fred A. Monaco ("Monaco"), to testify. (Tr. 46-50). The ALJ asked Monaco to consider an individual of the same age, education and work history as Mathis, who had the ability to perform sedentary work with rare climbing of ramps and stairs, no crouching, crawling, or kneeling, no operation of foot controls, and allowance for the use of a cane for ambulation, and asked if there were a significant number of jobs in the national economy such a person could perform. (Tr. 47). Monaco responded that there would be jobs in the national economy to accommodate such a person, including surveillance system monitor, machine feeders and operators, and bench assembly of various small products. (Tr. 47). Monaco testified further that the same jobs would be available if an at-will sit/stand option was added to the person's restrictions. (Tr. 48). However, Monaco testified that no jobs would be available if the same individual's impairments required him to be off-task more than ten percent of the workday on a consistent basis. (Tr. 48). Mathis' attorney then asked Monaco whether there would be any jobs available for the same individual if he had to lie down frequently during the day due to his pain symptoms. (Tr. 48-49). Monaco responded "no." (Tr. 49).

### E. The Administrative Law Judge's Decision

The ALJ made the following findings which are listed verbatim from his decision, citations omitted:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2007.

2. The claimant has not engaged in substantial gainful activity since November 24, 2006, the alleged onset date.

3. The claimant has the following severe impairment: back disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined by 20 CFR 404.1567(a) and 416.967(a) except the claimant can rarely (1-10% of a work day) climb (ramp/stairs only), balance, and stoop. He can never crouch, crawl, or kneel. He requires sit/stand option at will. He cannot operate foot controls with the lower extremities. The work must not be precluded by the need for a cane for ambulation.

6. The claimant has no past relevant work.

7. The claimant was born on April 9, 1965 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not an issue because the claimant does not have past relevant work.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 24, 2006 through the date of this decision.

The ALJ then determined that, based on the claimant's application and the record before him, Mathis was not eligible for Supplemental Social Security payments or disability insurance benefits.

## III. STANDARDS OF REVIEW

### A. Jurisdiction

District Court review of an ALJ's decision regarding disability benefits is limited in scope. 42 U.S.C. §§ 405(g) provides "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain

review of such decision by a civil action." A decision of the Commissioner becomes final when the Appeals Council affirms an ALJ decision, denies review of an ALJ decision, or when a claimant fails to pursue the available administrative remedies. Aversa v. Secretary of Health & Human Services, 672 F.Supp. 775, 777 (D.N.J.1987); see also 20 C.F.R. §§ 404.905. This court has jurisdiction to review the case under §§ 405(g) because the Commissioner's decision became final upon the Appeals Council's denial of review of the ALJ's decision.

### B. Standards applicable to the ALJ's decision

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress clearly has expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565,108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

"Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability

unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

## IV. DISCUSSION

Mathis argues that the ALJ erred in rejecting the opinions expressed by Dr. Snow and Dr. Kalata. (ECF No. 10 at 5-12). In particular, in 2008, Dr. Snow completed a welfare form indicating that Mathis was permanently disabled due to "pain" from degenerative lumbar disc disease. (Tr. 239-40, 319). Dr. Snow also wrote a letter to Mathis' attorney stating that Mathis was "totally" disabled due to pain and an inability "to get around." (Tr. 340-41). Similarly, based on a consultative physical examination, Dr. Kalata found Mathis to be incapable of performing sedentary work. (Tr. 238). In his decision, the ALJ accorded "virtually no weight" to these medical opinions. (Tr. 20-21, 23, 29).

The ultimate question of disability is reserved for the Commissioner's determination. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990). For this reason, a statement by a treating physician declaring an individual to be "disabled" or "unable to work" is not entitled to significant weight. 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3). In *Willis v. Baxter International, Inc.*, 175 F.Supp.2d 819 (W.D.N.C. 2001), the United States District Court for the Western District of North Carolina explained:

> Absent a showing of vocational expertise, courts, as well as disability adjudicators, give little deference to the opinions of medical doctors on the ultimate determination of "disability." While many doctors are willing to sign letters drafted by attorneys that the patient/client is completely disabled, those opinions carry little weight, and the discussions in the pleadings concerning whether a doctor did or did not find plaintiff to be disabled are not critical to decision. It is a doctor's medical findings, however, that are most helpful in determining what impairments are interfering with the plaintiff's ability to work. Indeed, such medical information is most informative on the issue of the severity of the impairments.

*Willis*, 175 F.Supp.2d at 832.

The Third Circuit Court of Appeals has recognized that a claimant's disagreement with the ALJ's weighing of the medical sources' opinions and/or of a claimant's reasonably credible

limitations is in essence an objection to the ALJ's assessment of the claimant's residual functional capacity ("RFC"). *Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005). Thus, Mathis' objections will be addressed within the context of the ALJ's assessment of Mathis' RFC, which must be upheld if the same is found to be supported by substantial evidence. See 42 U.S.C. §§ 405(g), 1383(c)(3) (stating that the findings of the Commissioner must be sustained if supported by substantial evidence).

An RFC assessment is not a medical assessment, but an administrative finding reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e) (2006); SSR 96-5p. The responsibility of assessing a claimant's RFC rests with medical experts at the state agency level, with the ALJ at the administrative hearing level, or with the Appeals Council. *Id*. The ALJ is required to conduct an independent analysis of the relevant evidence and develop an appropriate RFC based upon that evidence. 20 C.F.R. §§ 404.1545, 416.945. It is the ALJ's exclusive duty, as fact finder, to make an RFC assessment. 20 C.F.R. §§ 404.1546(c), 416.946(c); *see Richardson v. Perales*, 402 U.S. 389, 399 (1971)(recognizing that the duty to weigh the evidence rests with the trier of fact, not the reviewing court).

The Third Circuit has stated that in considering the opinion evidence, the ALJ must weigh the relative worth of a treating physician's report against all submitted physicians' reports, and the ALJ is "required" to choose between conflicting medical conclusions. *Cotter v. Harris*, 642 F.2d 700, 705, *reh'g denied*, 650 F.2d 481 (3d Cir. 1981). In doing so, the ALJ need not credit "internally contradictory" evidence submitted by a claimant's treating physician. Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991). Additionally, an ALJ's consideration of the evidence will not be read in isolation, but rather, will be sufficient when the decision is "read as a whole." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). The ALJ is free to reject

limitations that he does not believe to be credibly established in the evidentiary record. *Johnson v. Commissioner of Soc. Sec.*, 529 F.3d 198, 205-206 (3d Cir. 2008); *Rutherford*, 399 F.3d at 553-555.

Here, there is no merit to Mathis' contention that the record fails to support the ALJ's RFC finding because he did not adopt Dr. Snow's opinion that Plaintiff was totally disabled from performing work, or fully credit Dr. Kalata's functional assessment that Plaintiff could not perform sedentary work, which was based primarily upon Mathis' subjective limitations expressed during a one-time consultative examination.

First, Mathis' contention that the ALJ "failed to consider" all of the medical and other evidence of record is simply wrong. (ECF No. 10, Mathis' Brief, at p. 11). To the contrary, the ALJ meticulously considered and explicitly cited to all of the evidence of record in his detailed and remarkably lengthy administrative decision. (Tr. 10-31). Simply put, nothing relevant or probative was ignored.

Second, Mathis' argument that Dr. Snow's opinion was based upon objective medical evidence and "not inconsistent" with other evidence is also wrong. (ECF No. 10, Mathis' Brief, at p. 8-9). As the ALJ explicitly discussed, Dr. Snow provided no findings in support of his opinion. (Tr. 12). In particular, Dr. Snow did not complete a "medical source statement" form detailing Mathis' functional limitations. Moreover, Dr. Snow's own treatment notes included very limited abnormal clinical findings (Tr. 12). For example, after discussing at length Mathis' diagnostic findings, the ALJ correctly noted that Dr. Snow's clinical findings indicated only some tenderness and some decreased range of motion, but, again, no neurological deficits other than an antalgic gait (Tr. 13, 21). In this regard, the ALJ observed that Mathis' antalgic gait was contrary to repeated observations that he ambulated "freely" with a "steady gait" and "without

16

assistance" (Tr. 14-19). In fact, the record shows that Mathis was observed with a cane and exhibited an antalgic gait only after he applied for disability, even though there is no indication in the record that Mathis was ever prescribed a cane. *See* SSR 96-9p (providing that a finding that a hand-held assistive device is medically necessary requires medical documentation establishing the need for such device to aid in walking or standing, and describing the circumstances for which it is needed). Furthermore, Dr. Snow's treatment of Mathis was essentially limited to narcotic medication (Tr. 21-24). Even though Dr. Snow stated his intent to wean Mathis off narcotics and transfer his care to a pain specialist, the ALJ noted that Dr. Snow continued to treat Mathis and prescribe narcotics (Tr. 22).

Third, Mathis' argument that Dr. Kalata's assessment of Mathis' limitations was supported by objective evidence is also incorrect. The ALJ's finding that Dr. Kalata's examination "showed very limited abnormal clinical findings" was consistent with Dr. Kalata's own report. (Tr. 19). As the ALJ noted, Dr. Kalata found full range of motion on all planes of the neck, full motor power, and no atrophy. (Tr. 19). The ALJ also noted that Mathis' performance at Dr. Kalata's examination was full of many significant discrepancies when compared to the contemporaneous medical reports, and along with other evidence, raised further questions about Mathis' credible limitations. (Tr. 19-20). Notwithstanding the inconsistencies with "the weight of the other evidence of record," the ALJ still gave some weight to Dr. Kalata's assessment of limitations regarding Mathis' lower extremities. (Tr. 20).

In making his RFC assessment, the ALJ considered other evidence that was inconsistent with Mathis' subjective pain complaints. For example, Dr. Snow's own nurse specifically noted that she observed Mathis bending and picking up a telephone "without difficulty" (Tr. 24). Both Drs. Carnes and Zimba opined that Mathis exhibited "pain-related behaviors," with Dr. Zimba

17

making the specific finding that there was no evidence of a radicular component and noting that his examination of Mathis was a "histrionic compensatory type exam." (Tr. 17-18, 22, 322). The ALJ also noted that Mathis was not compliant with physical therapy referrals, and although he requested a neck brace and lumbar support, there was "no documented use of such a device" (Tr. 20-22). The ALJ also voiced serious doubts as to Mathis' testimony that he was unable to do any grocery shopping, yard work, or household chores, in light of the fact that he lived with his elderly father and two "disabled" brothers. (Tr. 21, 25).

Notwithstanding the foregoing, the ALJ accounted for any reasonably credible subjective limitations in his RFC assessment, e.g., a sedentary exertional level; the ability to work with a cane; and, a sit/stand option at will. (Tr. 13, Finding No. 5). Based upon these limitations, and considering Mathis' vocational profile, expert vocational testimony supported the ALJ's conclusion that there existed a significant number of jobs that Mathis could perform despite the limitations from his medically determinable impairments. (Tr. 30-31).

Based upon the ALJ's thorough and detailed consideration of the record as a whole, the Court finds that the ALJ's RFC assessment, and his determination that Mathis is able to perform the exertional demands of certain types of sedentary work, are supported by substantial evidence of record.

## V.     CONCLUSION

For the foregoing reasons, it is respectfully recommended that Plaintiff's Motion for Summary Judgment [ECF No. 9] be denied. It is further recommended that the Commissioner's Motion for Summary Judgment [ECF No. 11] be granted and the decision of the Commissioner

denying Plaintiff's application for Supplemental Social Security Income and Disability Insurance Benefits be affirmed.

In accordance with the Federal Magistrates Act, 28 U.S.C. § 636(b)(1), and Fed.R.Civ.P. 72(b)(2), the parties are allowed fourteen (14) days from the date of service to file written objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of some appellate rights. See Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

cc:	The Honorable Maurice B. Cohill
	Senior United States District Judge